James McCartney, Attorney General, *et al.*

*v.*

The Chicago and Evanston Railroad Company *et al.*

*Filed at Mt. Vernon November 13, 1884.*

1. CORPORATION — *of its corporate existence—legislative recognition.* An act of the legislature, in 1865, confirming an ordinance of the city of Chicago granting permission to a railway company, chartered by special act, to lay a track on and over certain streets from a certain point to the city limits, and authorizing the company to build a bridge over the Chicago river, the giving of which privileges had been accepted, is held to be a legislative recognition that the company then had a corporate existence, and had taken corporate action in the way of carrying out the purpose of its charter.

2. SAME—*of an organization prior to the constitution of 1870—whether sufficient to meet the requirements of that instrument.* The persons named as corporators in a charter for a railway company, met within a few days after the passage of the charter, and by resolution adopted the same, and on the following day elected a president, vice-president, secretary and treasurer, and afterward authorized the president to survey routes and locate the road, and to make contracts for the right of way and depot grounds, and books were opened for subscription to the capital stock, which was all taken, and the company obtained permission of the commissioners of highways to locate and operate tracks along and across all roads and highways upon its route, and permission was obtained from the city of Chicago to locate and operate a track through a portion of the city and to build a bridge over the Chicago river, which grants were duly accepted, and the capital stock increased and subscribed for, though it did not appear that any of the subscriptions had been paid, and the company exercised other corporate acts. The charter under which these acts were performed, was granted, and the steps towards

an organization were taken, prior to the adoption of the constitution of 1870. It was *held*, that the charter of the company was in operation at the time the constitution took effect, and was not abrogated by section 2 of article 11 of that instrument.

3. RAILROAD—*constructing and operating a road within a city—a charter construed—legislative recognition as conferring the right.* The words "to" and "from" a place or city, are construed to mean to or from a point within the place to or from which a corporation is authorized to construct a railroad. Authority to construct and operate a railroad from the city of Chicago to any point in the town of Evanston, is held to authorize the location and operation of the road from any point within the city of Chicago.

4. Where a railway company is authorized to build a railroad from a city to another place, the fact it is also empowered to contract with a horse railroad company for the joint or separate operation of either or both companies' roads, as may be agreed on, will not operate as a limitation upon the railway company in respect to its entrance into the city.

5. But were it a matter of doubt whether a railway company may, under its charter, lay its track within the limits of a city, an act of the legislature confirming an ordinance of the city giving the company permission to lay its railway track in certain streets of the city, and declaring that the ordinance shall be held to confer on the company power and authority to construct and operate its road in the streets and over the bridge mentioned therein, until the same shall be altered, changed or amended by the common council, with the assent of the company, will remove the doubt and be regarded as a recognition of the right.

6. SAME—*as to the motive power to be used in a city—effect of ordinance limiting the use—option in that regard.* The passage of an ordinance by a city granting permission to a railway company to lay down tracks in certain streets, etc., which is accepted, with a resolution of such company that the proper construction of the ordinance is that the permission granted thereby was to operate in the city, cars with animal power only, and that the company should not connect with any other railroad on which other power is used, does not create a contract between the people represented by the city, and the railway company, to abandon for all time to come the use of steam within the city as a motive power; but such company may afterward, on permission of the city, use steam to move its cars in the city. Such ordinance and its acceptance confer a limited right or privilege, but do not prohibit the acquisition of a more enlarged one in the future.

7. Authority in the charter of a railway company to build either a horse railroad or a steam railroad within a city, confers a continuing option to use either steam or animal power, or both, upon its road, or any part of it, which might be exercised from time to time. Under it, the use of either motive power may be changed and the other substituted, as the company may see fit.

8. SAME—*relocation of line of road—whether the right exists.* The charter of a railway company conferred the power of relocation, and an ordinance of a city was passed giving the company permission to construct and operate its road in and over certain streets of the city, and over a bridge to be built at a certain place, and such ordinance was confirmed by an act of the legislature, which conferred the same power as the ordinance, until the same might be altered, changed or amended by the city council, with the consent of the company, and gave such power to amend, alter or change the ordinance, with the company's consent. It was *held,* that such company, after having once located and built its road within the city, had still ample legitimate authority, with the consent of the city, to relocate its track within the city, and take up its former track.

9. SAME—*use of passenger line in a city for freight purposes—necessity for petition of lot owners.* Where a railroad company lays its track in a street of a city, having the right to construct a track for passenger cars only, the city, under section 62, clause 90, of article 5 of the general law, has no power afterward to grant the use of the track for the operation of freight cars upon it, except upon a petition of property owners upon the street, as required in the statute, and a grant of the use of such track for freight purposes without the petition of property owners being void, such use is unlawful and a public nuisance, which the State may cause to be abated.

10. RIPARIAN OWNERS—*right to the use of the bed of the stream.* The owner of lots on each side of a navigable river, as the Chicago river, is also the owner of the underlying soil of the river, and may make any use of the river bed that suits his purpose, so that it does not materially or unlawfully interfere with the public easement to the use of the water in the stream.

11. HIGHWAYS AND BRIDGES *in cities and villages—municipal authority as to their construction and use—exercise of power by grant to railway company.* Cities and villages incorporated under the general Incorporation law, are made the representatives of the State with respect to the control of streets and highways and bridges within their limits, and are invested with power to lay out, alter or vacate streets, regulate the use of the same, and to construct and keep in repair bridges, viaducts, etc., and regulate the use thereof.

12. A bridge built by a railway company over a navigable stream within the limits of a city, for the use of the railroad, under an ordinance of the city granting permission, and providing the manner in which it should be built, may be regarded as having been constructed by the city, and as falling fairly within the power given it to construct and repair bridges, and regulate the use thereof.

APPEAL from the Superior Court of Cook county; the Hon. HENRY M. SHEPHARD, Judge, presiding.

This was an information in chancery, filed by the Attorney General of the State of Illinois and the State's attorney of Cook county, in behalf of the People of the State, to enjoin the Chicago and Evanston Railroad Company, and the Chicago and Lake Superior Railroad Company, from building a railroad bridge over the north branch of the Chicago river, north of Kinzie street, and from constructing and operating certain railroad tracks, under an ordinance passed by the city council of Chicago, December 24, 1883.

The Chicago and Evanston Railroad Company was incorporated by a special act of the General Assembly, February 16, 1861. (Private Laws 1861, page 487.) It was authorized to construct and operate a railroad, with horse-power or locomotive cars, "from the city of Chicago to any point in the town of Evanston," with authority to contract with the North Chicago Horse Railroad Company, or any other company or party, to operate their road, or the road of such other party. Section 2 of the charter contains this provision: "No authority is or shall be granted to said company, or to any other corporation or party, by the city of Chicago, to lay any railroad track in Wells, Dearborn, Wolcott, Cass, Rush, Pine, North or South Clark streets, or in Wabash or Michigan avenues, in the city of Chicago, but the laying of the same is hereby expressly prohibited."

August 17, 1864, the common council of the city of Chicago passed an ordinance giving permission to the Chicago and Evanston Railroad Company to lay its track on certain streets therein named, commencing at the intersection of Madison and La Salle streets, in the South Division, running thence north on La Salle street to Erie, in the North Division, and thence, by certain streets designated, to the northern limits of the city; and to maintain and operate therein railway cars and carriages, in the manner and upon the conditions required by the various ordinances in relation to the Chicago City Railway Company and the Chicago West Division Rail-

way Company. These ordinances pertained wholly to the management and operation of street railways. Section 2 of the ordinance also required the cars and carriages used to be not inferior to the best street railway cars or carriages then in ordinary use in the city, and fixed the fares for any distance within the city at five cents, being the same charged by other street railway lines. Section 4 authorized the company to construct a bridge across the Chicago river at La Salle street, the city to pay one-half the cost. The mayor entertaining doubts whether it sufficiently appeared, from the ordinance, that the company was limited strictly to the construction and operation of a street railway within the city, a certain preamble and resolutions were adopted by the Chicago and Evanston company, August 25, 1864, reciting the doubts of the mayor in the premises, and that for the purpose of removing such objections, and in consideration of his approval of the ordinance, it was resolved, among other things, as follows : "That it was the intention, and is the proper construction of said ordinance, that the Chicago and Evanston Railroad Company should operate the cars and carriages used upon their railway tracks within the limits of the said city of Chicago, with animal power only, and that the said railway should not connect with any other railroad on which any other power is used." A certified copy of these resolutions was delivered by the company to the city.

February 6, 1865, the General Assembly passed what is popularly known as the "ninety-nine year act." (Private Laws 1865, vol. 1, page 597.) The act is entitled "An act concerning horse railways in the city of Chicago." The first two sections extend the franchises of certain street railway companies, other than the Chicago and Evanston company, to ninety-nine years. The next is as follows :

"Sec. 3. An ordinance of the common council of the city of Chicago, entitled 'An ordinance concerning the maintenance and operation of the Chicago and Evanston railroad in

the limits of the city of Chicago,' as passed on the 17th day of August, A. D. 1864, is hereby confirmed, and shall be deemed and held to confer on the Chicago and Evanston Railroad Company power and authority to construct and operate their road in the streets and over the bridge mentioned therein, until the same is altered, changed or amended by the common council, with the consent of said company; and such ordinance may, from time to time, be changed, altered or amended, and such other provisions be made, as to the common council may seem proper, and be agreed to by said company. The prohibition as to the use of certain streets, in the second section of the charter of the Chicago and Evanston Railroad Company, is hereby reënacted, and shall remain in force until altered, released or amended by the common council of the city of Chicago, and said company."

On June 12, 1872, an ordinance was passed by the common council of the city, authorizing the Chicago and Pacific Railroad Company to construct and maintain a railroad, commencing at the western limits of the city, upon a route designated, to the north branch of the Chicago river; thence across the north branch to Jones avenue; thence on Jones avenue and Hawthorne avenue to Willow street, and upon certain other streets designated. The company was also empowered by the ordinance "to put down, construct and maintain, for passenger cars only, a single or double track, from the north side of Willow street, on Hawthorne avenue, to Larrabee street." Section 7 of the ordinance provided that the privileges granted to the Chicago and Pacific company were upon the express condition that it should permit the Chicago and Evanston company to use the tracks therein authorized to be laid upon the streets named, jointly with the Chicago and Pacific company, provided the ordinance should be null and void unless the tracks therein authorized were constructed within two years from its passage. By the same section the Chicago and Evanston company was authorized to connect

with the tracks of the Chicago and Pacific company, on Jones avenue, and to construct and operate a single or double track from thence northwesterly, on Jones avenue, to Southport avenue, and thence north to the limits, upon the same conditions imposed by the ordinance upon the Chicago and Pacific company.

Early in June, 1874, the Chicago and Evanston company and the Chicago and Pacific company constructed a short piece of track on Hawthorne avenue, jointly, each company paying one-half the cost, which track has ever since been kept in repair by the Chicago and Pacific company, and the separate track on Jones and Southport avenues to the city limits was constructed before June 12, 1872, the period of time required by the ordinance of 1872. The city of Chicago became incorporated in 1875, under the general act concerning cities and villages, approved April 10, 1872.

December 24, 1883, the city council passed an ordinance authorizing the Chicago and Evanston company to construct and operate a railroad, beginning at the northern boundary line of the city, near Herndon street, and thence southwardly, over certain property described, connecting with the present tracks of the Milwaukee and St. Paul Railway Company, and of the Chicago and Evanston company, in Hawthorne avenue, near the centre line of Lewis street, upon condition that the company, within ninety days, surrender all claims to the use of Southport avenue under any ordinances theretofore passed by the city, and remove its tracks therefrom. Section 2 of the ordinance authorizes the Chicago and Evanston company to construct and operate a railroad, commencing at the present terminus of its track near the junction of Larrabee street and Hawthorne avenue, thence southwardly, across certain described premises, and across block 9 of the assessor's division, south of Erie street and east of the Chicago river, to a point on the east bank of the river, in block 9, and thence across the river by means of a bridge, and across West Kinzie.

street, to a point of connection with the railroad tracks now laid in Canal street, or to and across such lands as the company may acquire in blocks 8 and 13 of the original town of Chicago,—such bridge to be constructed in such manner as not to unnecessarily obstruct navigation, and on a plan to be approved by the commissioner of public works.    Section 4 of the ordinance authorizes the company to use and operate all railroad tracks by the ordinance authorized to be laid, and theretofore authorized to be laid, in Hawthorne avenue, for all general business incident to railroads, by freight, passenger and other cars, or by steam or other power.    Section 12 provides that all the rights and privileges granted to the Chicago and Evanston company are, in like manner and subject to the same conditions, granted to the Chicago and Lake Superior company, and the two companies may jointly or severally construct and operate the railroad authorized by the ordinance, in such manner and upon such terms as may be mutually agreed upon between them.    The Chicago and Lake Superior Railroad Company was incorporated under the general Railroad act of Illinois, October 6, 1883.    No petition of the property owners representing more than one-half of the frontage upon so much of Hawthorne avenue or of Canal street as is sought to be used for railroad purposes under this ordinance, was ever had, but the Chicago and Evanston company disclaims any right or intention of using Canal street lengthwise.    The ordinance was immediately accepted, by formal vote of both companies, and was about to be put in force, and its grants acted upon by the two companies, when the information was filed.

The Chicago river is a part of the navigable waters of the United States flowing into the St. Lawrence, which were declared by the ordinance of 1787 for the government of the Northwest Territory, to be "common highways, and forever free, as well to the inhabitants of the said territory as to the

citizens of the United States." The river is navigated by vessels which sail upon the great lakes. About three-quarters of a mile from its mouth it divides into what are known as the north and south branches, which diverge almost at right angles with the main stream, both branches being navigable. Upon the north branch, and adjacent to the point at which the defendant companies propose to erect the bridge authorized by the ordinance of December 24, 1883, there are extensive wharves, warehouses and coal depots, used in connection with the business of navigation, for receiving and delivering freight to and from various ports on the great lakes. There are already two bridges across the north branch in that immediate vicinity,—one being a bridge erected by the city, and known as Kinzie street bridge, the other being the railroad bridge of the Chicago and Northwestern Railway Company, immediately below the former. The information prayed that the defendants might be enjoined from constructing any railroad track not already built, in any of the streets of the city, and from constructing any bridge over or across the north branch of the Chicago river, and from operating, by steam or other power, any cars or trains of any kind over any tracks or bridge whose construction was attempted to be authorized by the ordinance of December, 1883, and from operating, by steam or other power, any railroad cars or trains upon any tracks which had been authorized to be laid on Hawthorne avenue before the passage of the ordinance of December, 1883. The Chicago and Evanston company answered the information, and the Chicago and Lake Superior company filed a general demurrer. The court overruled an interlocutory motion for a preliminary injunction, and upon the final hearing, upon the pleadings and proofs, and upon the demurrer of the Chicago and Lake Superior company, the information was dismissed for want of equity, to reverse which decree the complainants have taken this appeal.

Mr. Melville W. Fuller, and Mr. J. L. High, for the appellants:

The Attorney General may, by information, enjoin an act threatened which will constitute a purpresture or public nuisance. 1 Daniell's Ch. Pr. 7, 8; Mitford's Eq. Pl. 104, 117, 196; *Attorney General* v. *Johnson*, 2 Wils. Ch. 87; *Attorney General* v. *Forbes*, 2 M. & C. 123; *Attorney General* v. *Terry*, L. R. 9 Ch. 423; *Attorney General* v. *Birmingham*, 4 K. & J. 528; *People* v. *Miner*, 2 Lans. 396; *People* v. *Railroad Co.* 68 N. Y. 71; *Davis* v. *Mayor*, 14 id. 526; *People* v. *Vanderbilt*, 28 id. 396; 26 id. 287; *Attorney General* v. *Hunter*, 1 Dev. Eq. 12.

The information is filed in the right of the State, first, as having the right to the soil under navigable waters; and second, to protect the interests of the public in navigation. *Martin* v. *Waddell*, 16 Pet. 307; *Pollard* v. *Hogan*, 3 How. 212; *Wilson* v. *Marsh Co.* 2 Pet. 245; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Pound* v. *Turck*, 95 U. S. 459; *Escanaba Co.* v. *Chicago*, 107 id. 678.

Any unauthorized obstruction of a navigable stream is a purpresture, which equity will enjoin. When the erection invades the proprietary right of the State, the court will enjoin, regardless of actual injury. *People* v. *Vanderbilt*, 26 N. Y. 287; 38 Barb. 382; 28 N. Y. 396; *People* v. *Railroad Co.* 68 id. 71.

The company's charter not having been in operation within ten days after the constitution took effect, ceased to exist. Const. of 1870, art. 11, sec. 2; *Chincleclamouche L. & B. Co.* v. *Commonwealth*, 100 Pa. St. 438.

The constitutional clause is self executing, and such corporate death may be pleaded in any proceeding in which the company asserts a corporate existence. *Carry* v. *Railroad Co.* 5 Iowa, 357; *Railroad Co.* v. *Railroad Co.* 36 Conn. 196; *In re Railroad Co.* 72 N. Y. 245; 81 id. 69; *Brooklyn Steam Transit Co.* v. *City of Brooklyn*, 78 id. 524; *Railroad Co.* v.

*Railroad Co.* 45 Cal. 365; *Canal Co.* v. *Railroad Co.* 4 G. & J. 1; *Greely* v. *Smith,* 3 Story, 657.

An injunction at the suit of a third person does not suspend or extend the legal periods of limitation. *Wilkinson* v. *Fire Ins. Co.* 72 N. Y. 499; *Barker* v. *Millard,* 16 Wend. 562.

The use of the word "from," in the charter, restricts the road to the corporate limits of the city as the *terminus a quo. Railroad Co.* v. *Payne,* 8 Rich. 000.

The company having exercised its power to locate its road, it was exhausted, and there can be no new location without a new grant of legislative power. Pierce on Railway Law, 218; *Attorney General* v. *Railroad Co.* 36 Wis. 488; *Aspden* v. *Nixon,* 4 How. 467; *Packet Co.* v. *Sickles,* 5 Wall. 580; *Russell* v. *Place,* 94 U. S. 606; *King* v. *Chase,* 15 N. H. 9; *Robinson* v. *Kruse,* 29 Ark. 575; *Newell* v. *Carpenter,* 118 Mass. 411; *Turnpike Society* v. *Hosmer,* 12 Conn. 361; *Railroad Co.* v. *Naylor,* 2 Ohio St. 225; *Railroad Co.* v. *Railroad Co.* 2 Swan, 282.

By the acceptance of the ordinance of August 17, 1864, the company is limited to animal power within the city, and can not use steam. *Railway Co.* v. *Lake View,* 105 Ill. 207.

The right to construct a bridge over a navigable stream is a franchise which must emanate from the State. It can not emanate from the city, which is limited to the granting of new licenses. *Railway Co.* v. *Story,* 73 Ill. 541; *Railway Co.* v. *Railway Co.* 87 id. 317; *Railroad Co.* v. *Dunbar,* 100 id. 110.

The power of the city to bridge the river being a public one, can not be delegated by ordinance. Cooley's Const. Lim. 204; Dillon on Mun. Corp. sec. 779; *East St. Louis* v. *Wehrung,* 50 Ill. 28; *Foss* v. *Chicago* 56 id. 354; *Bibel* v. *People,* 67 id. 172; *Kinmundy* v. *Mahan,* 72 id. 462; *State* v *Bell,* 34 Ohio St. 194.

Petition of a majority of property owners along the street was essential to the validity of the ordinance. Rev. Stat. chap. 24, sec. 62, par. 90.

Mr. E. Walker, for the appellees:

The ownership of land bounded upon rivers in which the tide does not ebb and flow, carries with it the title of the soil *ad filum aquæ.* 3 Kent's Com. 427; *Gould v. Railroad Co.* 2 Seld. 547; *Canal Trustees* v. *Havens,* 11 Ill. 557; *Chicago* v. *Laflin,* 49 id. 172; *Braxon* v. *Bressler,* 64 id. 488; *Railroad Co.* v. *Stein,* 75 id. 41.

As to the obstruction of passage in a stream, and when the erection of a bridge over a stream will be enjoined, see *Packet Co.* v. *Bridge. Association,* 38 Ill. 467; *Bridge Co.* v. *Lonergan,* 91 id. 516; *People* v. *St. Louis,* 5 Gilm. 351; *Railroad Co.* v. *Ward,* 2 Black, 485; *Pennsylvania* v. *Bridge Co.* 13 How. 518.

As to abatement of public nuisances by a court of equity, see *Dunning* v. *Aurora,* 40 Ill. 481; *Lake View* v. *Metz,* 44 id. 81; *Bridge Co.* v. *Railroad Co.* 6 Paige, 554; *Attorney General* v. *Cleaver,* 18 Ves. 217; High on Injunctions, sec. 520; *People* v. *Davidson,* 30 Cal. 379; *Bell* v. *Railroad Co.* 25 Pa. St. 161; *People* v. *Vanderbilt,* 26 N. Y. 292.

Mr. W. C. Goudy, also for the appellees:

The act incorporating the company, of February 16, 1861, was not repealed or annulled by section 2, article 11, of the constitution of 1870.

The existence of a corporation can not be questioned collaterally. *Commissioners* v. *Bolles,* 4 Otto, 104; 1 Gilm. 667; 84 Ill. 276; 89 id. 270; Angell & Ames on Corp. sec. 774.

The company was authorized to build and operate a road to a point within the city limits. The words "from" and "to" a place are construed as being within the places named as the *termini. Moses* v. *Railroad Co.* 21 Ill. 516; *Mason* v. *Railroad Co.* 35 Barb. 373; *Turnpike Co.* v. *Coventry,* 10 J. R. 389; *Bridge Co.* v. *Railroad Co.* 6 Paige, 554; *Railroad Co.'s Appeal,* 99 Pa. St. 155.

The company was authorized, when the bill was filed, to operate its road within the city by steam.

The company could use the tracks in Hawthorne avenue for freight as well as passenger cars, under section 4 of the ordinance of December 24, 1883.

Railroad companies have the power to relocate the lines of their roads after their completion under the first location. *Railroad Co.* v. *Devaney,* 42 Miss. 555; *Railroad Co.* v. *Lovejoy,* 8 Nev. 100; *Railway Co.* v. *Daniels,* 16 Ohio St. 390; *Knight* v. *Railroad Co.* 9 La. Ann. 284; *Railroad Co.'s Appeal,* 99 Pa. St. 155; *Ex parte Railroad Co.* 2 Rich. 434; *Railroad Co.* v. *Wilson,* 17 Ill. 127.

The power of the city over the streets, and its authority to allow railroads to lay their tracks in the same, is recognized and affirmed in the following cases: *Moses* v. *Railroad Co.* 21 Ill. 516; *Murphy* v. *Chicago,* 29 id. 279; *Stetson* v. *Railroad Co.* 75 id. 74; *Patterson* v. *Railroad Co.* id. 588; *Quincy* v. *Railroad Co.* 92 id. 23; *Railroad Co.* v. *People,* 92 id. 170; *Truesdale* v. *Grape Sugar Co.* 101 id. 564.

Until Congress exercises its power to regulate commerce, the State has full control of navigable streams, and of bridges over the same. *Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Gilman* v. *Philadelphia,* 3 Wall. 713; *Wilson* v. *Marsh Co.* 2 Pet. 245; *Pound* v. *Turck,* 5 Otto, 459; *Transportation Co.* v. *Chicago,* 9 id. 635; *Herrman* v. *Beef Slough Co.* 8 Biss. 334.

The State has confined the power over highways and bridges to the city, which is made the representative of the State. General Incorp. Law of 1872, art. 5, clauses 7, 9, 21, 25, 28, 30, 33, 38, 87, 90, sec. 10.

General authority over all highways implies the power to build a bridge, and to authorize a railroad company to erect such a structure for its use. *Mullasky* v. *Cedar Falls,* 19 Iowa, 21; *Dively* v. *Cedar Falls,* 27 id. 227; *Brown* v. *Town of Preston,* 38 Conn. 219; *Weathersfield* v. *Humphrey,* 20 id. 218; *Clark* v. *Saybrook,* 21 id. 313.

There was not only authority granted by the legislature to the city, through its charter, to construct the bridge according to the ordinance of December 24, 1883, but there was express authority given by the legislature through the charter of the railroad company, as amended by the act of 1865.

Mr. Justice Sheldon delivered the opinion of the Court:

It is contended by appellants that the Chicago and Evanston Railroad Company ceased to have corporate existence on the 8th day of August, 1870, (the day the constitution of 1870 went in force,) by virtue of section 2, of article 11, of that constitution, which reads: "All existing charters or grants of special or exclusive privileges, under which organization shall not have taken place, or which shall not have been in operation within ten days from the time this constitution takes effect, shall thereafter have no validity or effect whatever." It is denied that the charter of the company was in operation within the time fixed by the constitution.

The facts appearing are, that the company was incorporated February 16, 1861. The persons named as incorporators in the charter, constituted the first board of directors. The capital stock was fixed at $100,000, with power to increase it to $300,000. The incorporators named in the charter met February 19, 1861, and, by resolution, accepted the charter, and the following day elected a president, vice-president, secretary and treasurer. April 16, 1861, at a meeting of the directors, it was resolved that the president be authorized to survey routes and locate the road, and to make contracts for right of way and depot grounds. Resolutions were also passed authorizing the opening of books for the subscriptions to capital stock, and regulating the same. The stock was subscribed, but it does not appear that any payments were made on any of the subscriptions. February 21, 1861, the commissioners of highways of the towns of Lake View and

Evanston granted permission to the company to lay down and operate their railroad along and across all roads and highways along and upon which the route of their road might be located, and March 10, 1862, at a meeting of the board of directors, such grants of rights of way were accepted, by resolution. At the same meeting the president reported that he had purchased depot grounds in Evanston, and had contracted to give one share of stock therefor, and it was voted that the purchase be approved. At a meeting of the stockholders, June 10, 1864, the capital stock was increased to $300,000, which was subscribed the same month, but it does not appear that any payments were made on any of the subscriptions. August 17, 1864, the common council of Chicago passed an ordinance giving permission to the company to lay a track, commencing in the city of Chicago, at the corner of Madison and La Salle streets, and running thence north, on designated streets, to the northern limits of the city, and authorizing the company to construct a bridge over the Chicago river. The company, on the 25th of August, 1864, passed certain resolutions, declaring as to what was the proper construction of the ordinance, and, with such construction, the ordinance was accepted. February 6, 1865, the General Assembly passed an act confirming the above ordinance. This was a legislative recognition that the company had then a corporate existence, and that it had taken corporate action, in the way of carrying out the purpose of its charter, to the extent of having secured from the city of Chicago permission to lay its track in the streets of the city, and to bridge the Chicago river. January 9, 1865, the annual election of the corporation was held, and certain persons were elected directors. In the summer of 1865, John Evans, a subscriber of stock, filed a bill in the Superior Court of Cook county, against the Chicago and Evanston Railroad Company and others, on which a writ of injunction was allowed, by which all of the persons who were then acting as directors, or claiming to be such, were enjoined

40—112 ILL.

from assuming to act as directors of the company by virtue of the election held January 9, 1865. The injunction remained in force until in 1872, when it was dissolved. The existence of this injunction may afford somewhat of explanation for the intermission of any further corporate action during the pendency of the injunction.

These enumerated acts show that in addition to organization, there was considerable of corporate action in effectuation of the object of the charter. It is said that because it does not appear that any money had been received or expended, or any work done in the actual construction of the road previous to the time fixed by the constitution, the charter was not at that time in operation. The constitution is silent as to what extent the charter should have been in operation, requiring, merely, its being in operation. This was not the case of a dormant charter or of but a mere paper organization, as is claimed, and in view of all the corporate action which in this case had been had toward carrying out the purpose of the incorporation, we can not say that the charter of this company was not in operation at the time of the adoption of the constitution of 1870.

It is denied that the Chicago and Evanston Railroad Company has authority to construct and operate a railroad within the city of Chicago. Stress is laid upon the peculiar language of the charter in giving power to construct and operate a railroad "*from* the city of Chicago to any point *in* the town of Evanston," as indicating the intention to make the southern terminus of the road the northern boundary of the city of Chicago. The case of *Northeastern Railroad Co.* v. *Payne*, 8 Rich. (S. C.) 177,—the only one cited by appellant's counsel in support of this position,—is in point, as sustaining it. We are aware of no other like authority. The words *from* and *to* a place, have frequently, in the charter of a company, been construed to mean from and to a point within the place from and to which the corporation was authorized to construct its

road, and especially where there is found in the body of the' act anything indicating that intention.    *Moses* v. *Railroad Co.* 21 Ill. 516; *Farmers' Turnpike Co.* v. *Coventry,* 10 J. R. 389; *Mohawk Bridge Co.* v. *Railroad Co.* 6 Paige, 554; *Mason* v. *Railroad Co.* 35 Barb. 373; *Western Pennsylvania Railroad Co.'s Appeal,* 99 Pa. St. 155.    This is the reasonable interpretation which, we think, should be adopted in this case, as required by the public object of the grant, in the accommodation of the public with railroad facilities.

The difference of language employed with respect to the two places of Chicago and Evanston,—the language being, "from the city of Chicago to any point in the town of Evanston,"—is remarked upon as showing that the road was to commence to run from the northern boundary of the city of Chicago; that if the intention had been to run from any point in the city of Chicago, it would have been so expressed, as it was in regard to Evanston.    We do not attach any special importance to this difference of phraseology.    The concluding sentence of section 2 of the charter, that "no authority is or shall be granted to said company, or to any other corporation or party, by the city of Chicago, to lay any railroad track in Wells, Dearborn," and certain other streets named, in the city of Chicago, "but the laying of the same is hereby expressly prohibited," seems to indicate that the legislature intended to give power to enter the city and run to a point within it,—else why prohibit the use of certain streets within the city?    Appellant's counsel would refer this prohibition to the "North Chicago Horse Railroad Company, or any other company or party" with whom the second section of the charter provides that the Chicago and Evanston Railroad Company "may contract to operate their road, or the road of such other party, either separately or jointly, as may be agreed upon," and their construction being that these words last quoted were a restriction on the right to enter the city, and showed the purpose was to allow the company to build

its road from a point in the town of Evanston to the northern limits of the city, and then, by contract with the North Chicago City Railroad Company, or some other company, to enter the city. We do not agree with this view. We consider that the charter gave to the Chicago and Evanston company the power to construct their road to a point within the city, and also gave to them the further power to contract with the North Chicago Horse Railway Company, or any other company, for the reciprocal operation of each other's road, either separately or jointly, as might be agreed upon, and that this power given to so contract with the North Chicago Horse Railroad Company, or any other company, was not a limitation on the Chicago and Evanston company as to entrance in the city. But were there doubt on this point, it would seem to be removed by the act of the General Assembly of February 6, 1865, which confirmed the ordinance of August 17, 1864, giving permission to the company to lay its railway tracks in certain streets of the city, and declared that the ordinance should be held to confer on the company power and authority to construct and operate their road in the streets and over the bridge mentioned therein, until the same should be altered, changed or amended by the common council, with the consent of the company.

It is strenuously insisted that the Chicago and Evanston Railroad Company, if it has a corporate existence, and authority to construct its road to a point within the city of Chicago, is, within the limits of Chicago, only a street railway. The proposition is, that since the acceptance by the Chicago and Evanston Railroad Company of the ordinance of August 17, 1864, it was and is, and for the remaining period of its corporate existence must continue to be, a street railway company within the limits of the city of Chicago, and has forever abandoned and surrendered the right to the use of steam as a motive power within the city; that upon the signing of the ordinance by the mayor, accompanied, as the ordinance was,

with the company's resolution in regard to it, there became
a complete contract between the company and the people,
represented by the city authorities, which contract, in brief,
was, that in consideration of the grant by the city of the val-
uable rights embraced in the ordinance of August 17, 1864,
the company renounced and abandoned, for all time to come,
the use of steam as a motive power within the limits of the
city, from which contract the company has never been re-
leased; that there being thus an absolute incapacity on the
part of the company to operate any tracks by any other than
animal power within the limits of Chicago, resulting from the
voluntary contract of the company thus entered into, upon
full consideration, the city was powerless to grant or the com-
pany to receive the right to operate by steam within the city
limits, as attempted by the ordinance of December 24, 1883.
There is, throughout the ordinance of August 17, 1864, and
the company's resolution in regard to it, not a word expres-
sive of the idea of anything perpetual, or of future limitation
or restriction, in relation to the subject matter. Under and
by the terms of the ordinance, the company acquires some-
thing from the city, but it does not abandon or surrender
anything. The ordinance· gives permission to the company
to lay a railway track on certain streets in Chicago. The
resolution of the company in regard to it is, that the intention
and proper construction of the ordinance is, that the com-
pany shall operate its cars within the limits of Chicago with
animal power only. It merely declares what the ordinance
means,—defines the extent of the permission granted by it,—
so that by the ordinance, with the company's resolution, there
was given permission to use animal power only. And that
was the sum of it. Under the permission given by that ordi-
nance, there could clearly be used animal power only. There
was power in the city to give permission to use both animal
power and steam power, or either, within the city. It saw
fit, by that ordinance, to only give permission to use animal

power.   But there is no language in the ordinance indicative that the city might not, by some future ordinance, permit the use, within the city, of steam as a motive power, or suggestive of the idea that the city was tied up from giving, and the company from receiving, ever afterward, permission to so use steam power within the city.   All of anything savoring of perpetual, or of restriction in the future, which we discover in the ordinance, is in respect of the power of the city to recall what it granted by the ordinance.   It may be that the city could not, without the consent of the company, withdraw the permission which was granted by the ordinance.

The only possible foundation which we are able to see for this claim made by appellants, is, that the charter authority is but to build either a horse railroad or a steam railroad,— that there was an option with the company to build either kind of road, but that it was an option which could only be once exercised, and that therefore, when the company accepted the ordinance permitting the use of animal power, only, within the city, that was an exercise of its option to construct within the city a horse railroad; that there remained no further option on the subject, and that under the charter, the road within the city must ever afterward remain a horse railroad.   We can not adopt this construction of the charter. The power given by the charter was to operate the road to be constructed, with "horse power or locomotive cars."   We read this as giving an option to the company to use either animal power or steam power, or both, upon their road, or any part of it; that this was a continuing option, which might be exercised from time to time; that after the use, for a time, of either kind of power, the other kind might be substituted, as the company saw fit; so that when the common council gave to the company permission to use, within the city, only animal power, there could be, under that permission, only the authority to use that kind of power within the city; but still the right remained, under the charter, to use steam power

within the city whenever the city authorities should give permission to do so. The act of February, 1865, confirms the ordinance of August 17, 1864, and provides expressly that the ordinance may, from time to time, be changed, altered or amended, and such other provisions be made as to the common council may seem proper, and be agreed to by said company.

Appellee's counsel place reliance upon this act as giving full legislative authority to the city council to pass the ordinances of June 12, 1872, and December 24, 1883, granting to the Chicago and Evanston company permission to operate their road, within the city of Chicago, by steam power. If we could agree with appellant's counsel that there was, by the acceptance of the ordinance of August 17, 1864, a loss to the company of all right under their charter, at any time afterward, to operate their road within the limits of Chicago by steam power, even by permission of the city, then we should have difficulty in finding in this act alone, a source of legislative authority to use steam power within the city. The title of that act is: "An act concerning horse railways in the city of Chicago." The constitution of 1848, in force at the time of the passage of the act, has the provision: "And no private or local law which may be passed by the General Assembly shall embrace more than one subject, and that shall be expressed in the title." If this road within the city of Chicago was, at the time of the passage of this act, in all respects but a mere horse railway in the city, it might well be doubted whether the converting of it into a steam railroad, or the giving to the city authority to make such conversion, would be a subject expressed in the title of the act. But we do not feel the necessity of recourse to this act as giving the legislative authority. We look to the charter of the company as giving to it the right to operate its road within the city of Chicago with steam power, regarding, as already said, the right as never having been lost to the company, but as ever

having remained, with authority to so exercise it whenever permission to do so should be given by the city.

It is contended that the Chicago and Evanston company has no authority to change its tracks in the city of Chicago, as provided may be done by the ordinance of December 24, 1883. The charter of the company confers upon the corporation no power of relocation, and it is insisted that there is conferred but one power of location, and that the power of location having once been exercised, is exhausted, and that no new location of its line can be made, and hence that the power of location was exhausted by the ordinance of August 17, 1864, and that there can be no new location of its line, as contemplated by the ordinance of December, 1883. We shall not meddle with the question of the general power of a railroad company to change the location of its line of road once made, in the absence of any power of relocation given by its charter. There may not be entire agreement of the authorities upon that question. We shall confine ourselves to the power in this regard which exists with respect to this particular railroad within the city of Chicago.

The city of Chicago has been incorporated under the general law in relation to cities and villages, of 1872, since May, 1875. By clause 25, section 1, article 5, of that act, the city council has power "to provide for and change the location, grade and crossings of any railroad." By clause 9, to regulate the use of streets. The ordinance of August 17, 1864, located the road on certain streets in the city, in accordance with the desire of the company, and fixed the place for bridging the river. The act of February, 1865, confirmed that ordinance, and declared that the ordinance should be held to confer on the Chicago and Evanston Railroad Company power and authority to construct and operate their road in the streets and over the bridge mentioned therein, until the same was altered, changed or amended by the common council, with the consent of said company, and that such ordinance

might, from time to time, be changed, altered or amended, and such other provisions be made as to the common council might seem proper, and be agreed to by the company. It appears to us that there was here full legislative warrant for the change of location that was made. We deem it immaterial that there is no provision on the subject in the charter of the company. The ordinance of June 12, 1872, changed the route of the railroad from that mentioned in the ordinance of 1864, and required the surrender of a certain street mentioned in the former ordinance. The changes authorized by the ordinance of 1883 are: To remove the tracks of the company from the northwestern end of Hawthorne (formerly Jones) avenue, and from Southport avenue, and relay them on a line nearly two blocks east of Southport avenue, across a tier of lots which have been purchased or acquired by condemnation by the company; to extend the tracks from the southern end, as laid at the junction of Larrabee street and Hawthorne avenue, southeasterly, across land purchased, or acquired by condemnation, to the east bank of the north branch of the Chicago river, on block 9, a short distance north of the Kinzie street bridge; to construct a bridge across the river at that point, and extend the tracks thereon; to extend the tracks from the west bank of the river to a point of connection with the tracks laid on Canal street, which tracks lead into the union depot on the west side of the river, between Madison and Adams streets. This is an alteration and change of the location of the tracks of the railroad, and of the place of bridging the river, as they were fixed by the ordinance of 1864. It is in these respects an alteration and change of that ordinance, although the ordinance of 1883 does not so purport on its face, and we think that such change of location comes clearly within the express power given by the act of 1865, to alter, change and amend the ordinance of 1864, and make other provisions upon the subject, as well as within the power given to the city by the general law, to

provide for and change the location, grade and crossings of any railroad within its limits.

It is denied that these railroad companies have authority to bridge the north branch of the Chicago river. As is alleged, the information is filed in a dual right or capacity of the State,—being, first, the proprietary right of the State to the soil underlying its navigable waters; and second, its representative capacity to protect the interests of navigation in behalf of its citizens concerned therein.

It appears that at the time of the hearing of the case in the court below, the Chicago and Evanston company was the owner of the lots and docks on the east side of the river at the point where the bridge is proposed to be built, and had commenced proceedings to acquire title to the private property on the west side, under the law of eminent domain, since when, as alleged, it has acquired such title under such proceedings. It follows, then, that the company, as owner of the property on each side of the river, is also owner of the fee in the underlying soil of the river there, and may make any use of such river bed as suits its purpose, so that it does not materially or unlawfully interfere with the public easement to the use of the water in the stream. This is abundantly settled by the decisions in this State: *Middleton* v. *Pritchard*, 3 Scam. 520; *Canal Trustees* v. *Havens*, 11 Ill. 557; *City of Chicago* v. *Laflin*, 49 id. 172; *Braxon* v. *Bressler*, 64. id. 488; *Railroad Co.* v. *Stein*, 75 id. 41. There is, then, in this case no question of purpresture,—there is no intrusion upon the property of the State, and no public nuisance resulting from an invasion of the property rights of the people, and the information manifestly fails upon the first ground of the proprietary right of the State to the soil underlying its navigable waters.

In the recent decision of the Supreme Court of the United States, in the case of *Escanaba Co.* v. *Chicago*, 107 U. S. 678, sustaining an ordinance of the city of Chicago requiring all

bridges across the Chicago river to be closed within certain hours, the doctrine is laid down, that until Congress acts upon the subject, the power of the State over bridges across its navigable waters is plenary. And it is there said: "And nowhere could the power to control the bridges in that city, (Chicago,) their construction, form and strength, and the size of their draws, and the manner and time of using them, be better vested than with the State, or the authorities of the city upon whom it has devolved that duty." The city we look upon as the representative of the State, with respect to the control of streets, and highways, and bridges, within the city limits. The general act for the incorporation of cities and villages, adopted by the city of Chicago, contains the following provisions: Article 5, section 1, clause 7, gives the city council power to lay out, establish and alter streets, etc., and vacate the same. Clause 9, "to regulate the use of the same." Clause 25, "to provide for and change the location, grade and crossings of any railroad." Clause 28, "to construct and keep in repair bridges, viaducts and tunnels, and to regulate the use thereof." Article 5, section 10: . "The city or village government shall have jurisdiction upon all waters within or bordering on the same, to the extent of three miles beyond the limits of the city or village, but not to exceed the limits of the State." The ordinance of December, 1883, provides as to the construction of the bridge, that "said bridge shall be constructed in such a manner as not to unnecessarily obstruct navigation, and on a plan to be approved by the commissioner of public works of the city of Chicago."

The State itself, no doubt, might construct the bridge. It might, as the legislature has here done, vest the local government of the city with authority to build the bridge. But it is claimed that the authority is reposed only in the city itself to build bridges, and is a power which is incapable of being delegated by the city to another. We do not consider that there is any delegation of the power in the case. The city,

through the corporation, does build the bridge. It matters. little by what hands the bridge is built, or who lets the contract for the construction. The essential thing is determining whether the public interest calls for a bridge, and where and in what manner it shall be built,—and this is done by the city authorities. We think the authorization by the city, as in this case, of the building of the bridge by a corporation, comes fairly within the power given to the city to construct and keep in repair bridges, and to regulate the use thereof. But further, the same may be remarked of the act of 1865, as expressly authorizing the building of the bridge, as was said of the act in reference to the change of location of the road. The ordinance of August 17, 1864, authorized the Chicago and Evanston company to construct a bridge to cross the Chicago river at La Salle street. The act of 1865, in confirming that ordinance, certainly gave the legislative sanction to the building by the company of a bridge at La Salle street, and the provision of the act, that the ordinance might, from time to time, be changed, altered or amended, gave the power, we think, to change the place of the building of the bridge from La Salle street to the place designated in the ordinance of December, 1883.

It is insisted that these defendant railroad companies have no right to use Hawthorne avenue and Canal street longitudinally, as there has not been the consent thereto of a majority of the property owners upon such streets. The provision of the statute upon the subject is as follows : "The city council or board of trustees shall have no power to grant the use of, or the right to lay down, any railroad tracks in any street of the city, to any steam or horse railroad company, except upon a petition of the owners of the land representing more than one-half of the frontage of the street, or so much thereof as is sought to be used for railroad purposes." (Section 62, clause 90, of article 5, of the general city and village incorporation law, before cited.) The Chicago and Evanston com-

pany disclaims any intention to run longitudinally through any portion of Canal street, and the ordinance does not seem to give the permission to do so, the language, in this respect, being, "thence across the Chicago river by means of a bridge, and across West Kinzie street, to a point of connection with the railroad tracks now laid on Canal street." As respects Hawthorne avenue, the fourth section of the ordinance of December, 1883, provides that the Chicago and Evanston Railroad Company "may use and operate all railroad tracks hereby authorized to be laid, and heretofore authorized to be laid, in Hawthorne avenue, for all general business incident to railroads, by freight, passenger and other cars, and by steam or other power." The tracks theretofore authorized to be laid in Hawthorne avenue were under and by virtue of the ordinance of June 12, 1872. Section 1 of that ordinance, after naming a certain route, provides, "and also to put down and construct and maintain, for passenger cars only, a single or double track, from the north side of Willow street, in Hawthorne avenue, to Larrabee street." It is by virtue of this ordinance, alone, that any authority had been given to lay tracks in Hawthorne avenue, and reference is made to this provision in the fourth section of the ordinance of December, 1883. This ordinance, in 1872, was passed when the city of Chicago was acting under its former special charter, and before the time of its becoming incorporated, in 1875, under the general act for the incorporation of cities and villages, under which it has ever since been acting. The former special charter, in 1872, did not require the consent of the majority of the property owners fronting upon a street, in order to the laying down in it of a railroad track. Such requirement is only by the general act. It is under and by virtue of the ordinance of June 12, 1872, that the Chicago and Evanston company claims justification of the authority given by the ordinance of 1883 to use the tracks in Hawthorne avenue "for all general business incident to railroads,

by freight, passenger or other cars," without having obtained the consent of a majority of the property owners fronting upon the street. But the permission and authority which were granted by the ordinance of 1872, to lay tracks in Hawthorne avenue, was to "put down, construct and maintain, for passenger cars only, a single or double track." Here is a careful restriction to passenger cars only. Permission to lay down a track for passenger cars only, is something quite different from a permission to lay a track for freight cars. There is a substantial and most material distinction as respects the two classes of cars, the hurtful effects from the operation of freight cars in the streets of a city being very much greater than in that of passenger cars.

It is said that the consent required is only as to the laying down of tracks, and not as to the use of tracks which have been constructed; that the laying of the tracks was under authority of the ordinance of 1872; that the ordinance of 1883 but permitted an enlarged use of tracks already laid,— a use for freight cars; that in case of a railroad track, once rightfully laid, there is no restriction upon the city as to granting any use of it. This we regard a too strict interpretation of the provision in question. Where a railroad company lays its track in a street, having but the right to construct and maintain a track for passenger cars only, we think that under this provision of the statute the city has not power afterwards to grant the use of the track for the operation of freight cars upon it, except upon a petition of property owners upon the street, as named in the statute. The granting of the use of freight cars upon a track which was one for passenger cars only, would, we consider, within the intendment of this statute provision, be tantamount to granting the right to lay down a track for freight cars, and so come within the provision. But if the grant of this use for freight cars be unauthorized, it is objected that the complainants in this case have no right to any relief as to the use of freight cars

in Hawthorne avenue; that the city has the exclusive control of the streets, and represents the public in all matters concerning them, and that no complaint can be made other than by the city, or by the abutting property owners, whose consent should have been obtained. Where this required consent has not been obtained, the city is absolutely without power to grant the license, and the exercise of it would be wholly without warrant, and unlawful. It is not the city alone, or abutting property owners, that are concerned about the unlawful obstruction of a street of a city. All the people of the State are entitled to the use of such street as being a public highway, and are interested to have it maintained free from unlawful obstruction, and we are of opinion that the complainants in this case are entitled to the relief they ask as to the use of freight cars in Hawthorne avenue, to prevent a public nuisance.

Much of what has been said with respect to the Chicago and Evanston Railroad Company applies, of course, to the Chicago and Lake Superior Railroad Company. The latter company stands in a different position from the former, in its having filed a demurrer, and thereby admitted the allegations of the information. But as we do not see that the ordinance of December, 1883, does authorize the use of Canal street lengthwise, we think the decree of dismissal of the information may stand against both companies alike, although the Chicago and Lake Superior company has not, like the other company, disclaimed any right or intention of using Canal street lengthwise, under the ordinance of December 24, 1883.

The decree dismissing the information will be affirmed in all things except in the respect of the use of freight cars in Hawthorne avenue. In that respect the decree is reversed, and the cause remanded for further proceedings conformable to this opinion.

*Decree reversed in part and in part affirmed.*

Mr. JUSTICE SCOTT, dissenting:

The case being considered is of such importance, in dissenting from the judgment to be rendered it seems proper that I should state my reasons, in part, at least, for so doing. As respects some of the questions involved, I concur with the majority of the court, but perhaps for reasons other than those assigned in the principal opinion. I shall only remark upon what I regard as the controlling questions in the case. That my views may be better understood, I wish first to make a statement of the matters at issue, as they appear to me from the pleadings and the evidence.

The bill is an information in chancery, brought by the Attorney General of the State for and in the name and behalf of the People, by the authority of the People of the State, and also in their proprietary right as owners of the soil of the Chicago river, against the Chicago and Evanston Railroad Company and the Chicago and Lake Superior Railroad Company, and was to enjoin and restrain such corporations, or either of them, from in any manner building, erecting, constructing or working upon any railroad track, embankment, superstructure or railroad not already built in any of the streets of the city of Chicago, and from building, erecting or constructing any bridge over or across the north branch of the Chicago river. It is alleged the Chicago and Evanston Railroad Company was incorporated under a special act of the legislature, passed in 1861, and the charter is set out at length, so that it fully appears what power the corporation could properly exercise, if it is still an existing corporation, under that act and the amendatory act of 1865. It is also alleged the Chicago and Lake Superior Railroad Company was incorporated October 6, 1883, under the general laws of the State, and its powers as a corporation are, of course, derived from the general law in relation to the incorporation of railroad companies.

Among the grounds upon which relief is demanded, are, first, that the charter of the Chicago and Evanston Railroad Company of 1861, as amended by the act of 1865, was repealed or annulled by section 2, article 2, of the constitution of 1870, for the reason, it is alleged, such corporation was not, previous to the adoption of the constitution, organized, nor was it in operation within ten days after it went into force, on the 8th day of August, 1870; second, that the Chicago river is a navigable river, and that the title to the soil and bed of the river is in the People of the State of Illinois, and that the corporations named as defendants, purpose, under powers claimed to be derived from their charter, and the general Incorporation law, and certain ordinances of the city of Chicago, to construct a bridge over the north branch of the Chicago river, near Kinzie street, and that it is unlawful for such corporations, or either of them, to construct such bridge without first having obtained authority so to do from Congress, or from the legislature of the State of Illinois; and third, that the Chicago and Evanston Railroad Company has no authority of law to construct any railroad for general business within the limits of the city of Chicago, and to operate the same with steam power. All other allegations are in support of these general propositions. So far as other matters contained in the bill may be deemed important to an understanding of my views, they will be stated.

It is not claimed the Chicago and Evanston Railroad Company has any authority from the State to construct and operate its railroad within the limits of the city, or to construct a bridge across the Chicago river, other than that which is contained in its original charter of 1861, and the amendatory act of 1865. If it has any other authority, it is derived solely from city ordinances the validity of which is challenged by appropriate allegations contained in the bill. As has been seen, the Chicago and Lake Superior Railroad Company was organized under the general law in relation

41—112 Ill.

to incorporating railroad companies. Railroad companies organized under that law have express authority to bridge all streams it may be necessary to cross in constructing their respective roads, whether navigable or not. No railroad company, however, can construct its line of road along or across any street within the limits of an incorporated city or village without first having obtained the consent of the municipal authorities of such city or village. The only authority it is insisted the Chicago and Lake Superior Railroad Company has now or ever had for entering and operating its line of road within the limits of the city, is contained in the ordinance of December 24, 1883. So, too, the authority of the Chicago and Evanston road to construct and operate its road within the limits of the city on the route now proposed, if any exists, is contained in the same ordinance. The only license from the city to either corporation to construct a bridge over the Chicago river at the point indicated, is given by the same ordinance of 1883. The authority or validity of that ordinance is challenged by the bill for two reasons: First, the city has no authority to authorize either corporation to construct a bridge over the Chicago river,—such authority, it is said, could only come from Congress or the State; and second, the municipality of Chicago has no power, under its charter, to permit either corporation to construct or operate any line of railroad on Canal street or Hawthorne avenue, except upon the petition of a majority of the owners of land abutting on such streets. No consent was ever given by the property owners on such streets, to either corporation, to construct its road on either street, and it is alleged the ordinance in that respect is null and void. The admission in the record in regard to this allegation of the bill is, "that no petition of the property owners of lands representing more than one-half of the frontage of Hawthorne avenue or of Canal street, or of so much thereof as is sought to be used for railroad purposes, under and by virtue of said ordinance

of December 24, 1883, was ever had or procured, but defendants disclaim any right or intention of using Canal street lengthwise, under said ordinance of December 24, 1883." No permission had previously been given, by any ordinance of the city, to any company, to construct any railroad for general business, and operate the same either in Hawthorne avenue or in Canal street. It seems some track had previously been laid in Hawthorne avenue, either by the Chicago and Pacific Railroad Company or the Chicago and Evanston Railroad Company, or by both, and which the Chicago and Lake Superior and the Evanston companies were authorized to use by the ordinance of 1883. That track in Hawthorne avenue seems to have been laid under an ordinance passed in 1872. Steam was authorized by that ordinance as a motive power in propelling cars, but both companies that had the right to use such track in Hawthorne avenue were restricted to moving only passenger cars over it. The ordinance of 1872 was afterwards repealed by the city council, in 1876. It is said by the defence, that repealing ordinance was declared by the United States Circuit or District Court to be invalid or void, and for that reason it should not now be regarded as ever having had any force. It matters little whether it was or not. The Chicago and Evanston Railroad Company, only, answered the bill. It denied all the charges of want of authority to construct and operate its road within the limits of the city, or to construct a bridge over the Chicago river in connection with its road, and asserted its right and power to construct and operate its railroad under its original and amended charters, and under the ordinances of 1872 and 1883. Its answer was not under oath, that having been waived, and to which a replication was filed. The Chicago and Lake Superior company made no answer to the bill, but filed a demurrer thereto, which was sustained. Upon the final hearing, upon bill, answer and proof, the court dismissed the bill.

The charters of the defendant corporations, and the franchises they may therefore exercise, are so different, it will be most convenient for me to consider them separately, in some respects. It is seen that by section 12 of the ordinance of December 24, 1883, all the rights, privileges and powers by that ordinance granted to the Chicago and Evanston Railroad Company, were in like manner, and subject to the same restrictions, granted to the Chicago and Lake Superior Railroad Company. A new ordinance containing the same identical provisions, applicable to the latter company alone, would have had no greater force. Every license or privilege granted to the Evanston company is available for the benefit of the Chicago and Lake Superior Railroad Company, in as full a measure as if the former company never had any existence; and if it should be found to have no right to exercise the privileges conferred by the ordinance, that fact would not militate against the right to exercise the privileges conferred on the Lake Superior company by the ordinance. Regarding every section of the ordinance as specifically applicable to the Lake Superior company, as may be done, what privileges may it exercise? It is granted a license or privilege to construct, maintain and operate, with steam power, a railroad, with one or more tracks, and such switches, sidings and turn-outs as the company may deem necessary, along and upon a route definitely described. By the first section, permission was given to connect with tracks then in Hawthorne avenue. That, of course, would be equivalent to giving that company the right to acquire the use of such track, and the privilege to construct for its own use such other tracks, switches, sidings and turn-outs as it might deem necessary. By the second section permission was given, in the construction of another part of its road, after crossing the Chicago river and West Kinzie street, to connect with "tracks now laid in Canal street." By the fourth section this company was authorized to use and operate all railroad tracks by the ordinance author-

ized to be laid, or before that time authorized to be laid, in Hawthorne avenue, for all general business incident to railroads, by freight, passenger and other cars, by steam or other power. It was, however, provided, the company should not run over such tracks, trains of more than thirty cars, and that all regular trains should be run at least ten minutes apart, and not oftener. What is all this but a license to a railroad company recently organized under the general law, with a franchise to construct a railroad from Chicago to Lake Superior, for the transaction of a general freight and passenger business, in cars to be propelled by steam or other power, within the limits of the city, and along and in certain streets? Plainly, that is what this ordinance means, and no reasoning can justify any other construction. So far as the municipal government by this ordinance attempted to grant to this company the privilege to construct and operate its road lengthwise in any street in the city except upon a petition of the owners of the land representing more than one-half the frontage of such streets, it is void. (Rev. Stat. 1874, chap. 24, art. 5, sec. 1, div. 90; *Railroad Co.* v. *Dunbar,* 100 Ill. 110.) The ordinance in that respect is void for want of power in the common council to enact it. A fair construction of the ordinance is, this company may, in the construction of its road, occupy lengthwise a portion of Hawthorne avenue and Canal street. It is averred in the bill it is the intention of the company to do so, and the demurrer admits the allegation of the bill, so far as it appears. That being so, I am of opinion it was clearly error in the court to sustain the demurrer to the bill, and the decree as to the Chicago and Lake Superior Railroad Company ought for that reason be reversed.

Passing now to consider matters that alone affect the Chicago and Evanston Railroad Company, the first question that presents itself is, whether its charter of 1861, as amended by the act of 1865, since the adoption of the constitution of

1870 has any validity or effect.    Section 2, article 11, of that instrument, declares: "All existing charters or grants of special or exclusive privileges under which organization shall not have taken place, or which shall not have been in opera= tion within ten days from the time this constitution takes effect, shall thereafter have no validity or effect whatever." It appears the company was in fact organized soon after the passage of its original charter, in 1861, and an organization has been maintained ever since, by the election of the usual officers for such corporations.    It seems no work had in fact been done towards the actual construction of its track prior to that date.    But that was perhaps not essential.    The corporation was in fact organized, in a certain sense.    It had done, prior to that date, corporate acts, some of them important, and others of little moment; but, all considered, they make it apparent it was a corporation for some purposes.    This much may be fairly conceded.    But it must be remembered, that so far as any organization was perfected, it was for the purpose of constructing a railroad *exclusively* for carrying passengers between Chicago and Evanston, with the right to use *only* animal power within the limits of the city of Chicago, as will more fully appear further on in the discussion, and *not* a railroad for general business, both freights and passengers, using steam as a motive power.    If the latter is the character of the corporation, then it was not organized as such a corporation prior to the adoption of the present constitution of the State, and certainly no one can claim it was in operation as a corporation for the construction of a railroad for general business, within ten days after that instrument took effect. The utmost any one insists upon is, that in 1870, when the constitution took effect, the company was organized to construct a horse railroad within the city of Chicago.    If the corporation can be construed to be one for the construction of a railroad for general business both in freights and passengers, then it can not be insisted, with any show of reason,

it was in operation for such purpose within ten days after the taking effect of the constitution, and hence the charter could have "no validity or effect whatever."

But a point is made that ought, in my judgment, to warrant relief against the proposed action of the Evanston company under the ordinance of 1883. It is, that, conceding the charter of the Chicago and Evanston Railroad Company is still in existence, and has force notwithstanding the adoption of the constitution of 1870, its road, since its acceptance of the ordinance of 1864, is and can be nothing more than a street railway within the limits of the city of Chicago, to be operated by animal power,—and the company can not lawfully operate such cars by steam, as is proposed to be done under the recent ordinance. By its original charter the company was authorized to operate its cars with animal or steam power, at its option. It also had authority, under that act, to connect with the North Chicago Horse Railway Company, or any other company, and make running arrangements with such companies. It is recited in the preamble to the ordinance of August 17, 1864, the Chicago and Evanston Railroad Company, under its charter of 1861, was authorized to locate, construct and operate a railroad, with horse power or locomotive cars, from Chicago to Evanston; that the company, in pursuance of such leave, commenced the location of their road, and desired to locate upon a route described: it was therefore ordained that permission be given the company to lay a single or double track railway on a certain route, and to keep, maintain, use and operate thereon railway cars and carriages, in the manner and upon the conditions set forth and required by the various ordinances passed and now in force in relation to the Chicago City Railway Company and the Chicago West Division Railway Company, except as the same were by that ordinance modified. The railways to which reference is made in section 1 of the ordinance, were both street or horse railways, for the exclusive purpose of carrying

passengers, and upon which animal power was used to move cars. Notwithstanding this fact was well known, the mayor of the city hesitated, and refused to approve the ordinance, on account of certain doubts which he entertained in relation to the proper construction of such ordinance, and on account of certain objections; and for the purpose of removing such doubts and objections, the board of directors of the company, by resolution, declared "that it was the intention, and is the proper construction of said ordinance, that the Chicago and Evanston Railroad Company should operate the cars and carriages used upon their railway tracks within the limits of the city°of Chicago, with animal power only, and that said railway company should not connect with any other railroad on which any other power was used;" and also further declared, by a resolution of the same series, "that the said ordinance, subject to the aforesaid construction of the same," was accepted by the company. On the presentation of a certified copy of these resolutions, with others adopted at the same time, the mayor approved the ordinance. In the act of 1865, entitled "An act concerning horse railways in the city of Chicago," this ordinance is referred to, in section 3, as an ordinance of the common council of the city of Chicago, entitled "An ordinance concerning the maintenance and operation of the Chicago and Evanston railroad in the limits of Chicago," as having been passed on the 17th day of August, 1864, and it was by that act confirmed, and it was declared, "it shall be deemed and held to confer on the Chicago and Evanston Railroad Company power and authority to construct and operate their road in the streets and over the bridge, as therein mentioned, until the same is altered, changed or amended by the common council, with the consent of the company."

It is conceded that section 3 of the act of 1865, concerning horse railways in the city of Chicago, is an amendment to the original charter of the Chicago and Evanston Railroad

Company, as passed in 1861; and I am inclined to adopt as correct the suggestion of counsel for defendants: "It might be said that thereby this ordinance became a part of the charter of the railroad corporation. As the ordinance had been accepted by the railroad company, it was a legislative approval of such acceptance." It is expressly referred to in the act of the legislature by its title, and is confirmed, and it is declared it shall be deemed to confer authority upon the company to construct and operate its road as in the ordinance mentioned. How was it to be operated? It was as other street railways were to be operated, and the company conceded, by a resolution, that was animal power alone, and that it could not connect with any other railroad that used any other power. By the passage of the amendatory act of 1865, the Chicago and Evanston railroad became a street railway within the limits of the city of Chicago, precisely as were the Chicago City railway and the Chicago West Division railway, and could only be operated by animal power. Had the company laid its track and put its road in operation under the amendatory act of 1865 and the ordinance of 1864, no one would contend it would have been anything but the usual street railway, to be operated by animal power, and to be used exclusively for carrying passengers. It is too evident to need illustration, that under that act of the legislature and that ordinance of the city, which became a part of the charter of the company by being incorporated in the act of 1865, it had no lawful authority to construct any other kind of a railroad. To all intents and purposes it was then merely a street railway within the limits of the city of Chicago, and nothing else, whatever it was between that city and Evanston. Since then there has been no legislative amendment to the charter of the railroad company. Nor can there be any amendment by special law, under the present constitution of the State. It remains precisely as it was after the passage of the act of 1865. That amendment was inconsistent with the original

charter of 1861, in that it restricted the motive power within the corporate limits of the city of Chicago to animal power. So far as the two acts were or are repugnant, the latter act operated, by implication, as a repeal of the former.

The railroad that is proposed to be constructed, under the ordinance of 1883, by the Chicago and Evanston Railroad Company, is not what is known as a street railroad, which is limited to carrying passengers, usually, within the limits of the city, but the proposed road is one for the transaction of a general business, both freights and passengers, using steam as a motive power. The company is authorized to run over the tracks, within the limits of the city of Chicago, trains consisting of not more than thirty cars, and the only restriction as to the number of trains that may be run, is, that regular trains shall be run at least ten minutes apart, and not oftener. Obviously a corporation exercising or proposing to exercise such extraordinary powers, must have a franchise emanating from some source capable of granting it. Whence has the Chicago and Evanston Railroad Company such a franchise? Surely it did not emanate from the State. The grant from the State was to construct, maintain and operate what is known as a street railway, for carrying passengers, and using only animal power. It is not claimed by any one that a municipal government can grant a corporate franchise. All franchises, as is well known, emanate from the sovereign power, and in the American States emanate from the government, and owe their existence to a grant, or exist by prescription, as at common law, which presupposes a grant. A municipal body, it is understood, possesses no power to grant a franchise, in the technical sense that term is used in the law. Nor is it claimed the city of Chicago, under powers derived from the general Incorporation act, under which it is organized, can re-create a street railway company, and endow it with additional franchises to do a general railroad business, both freights and passengers, in cars moved by

steam, over the same track. A horse railway in the street of a populous city, carrying only passengers, and an ordinary steam railway transacting the customary business of such a road, are distinct and essentially different corporations. The franchises possessed by such corporations are not the same.

It is admitted that on the passage of the act of 1865, and its acceptance, within the city of Chicago the Evanston company was to be regarded as a horse railroad, as distinct from a steam railroad. How has it been changed from a horse railroad to a steam railroad? No source of power is suggested for this particular railway company to transact the general railroad business within the city of Chicago, using steam as a motive power, other than city ordinances. What authority is there in the municipal government to enact or ordain these ordinances, under which the company proposes to construct, maintain and operate its railroad within the limits of the city? The only semblance of power is section 3 of the act of 1865, entitled "An act concerning horse railways in the city of Chicago," and even that seems so slight as hardly sufficient to sustain any plausible argument in support of the validity of the ordinances. That section declares the ordinance passed August 17, 1864, "shall be deemed and held to confer on the Chicago and Evanston Railroad Company power and authority to construct and operate their road in the streets and over the bridge mentioned therein, until the same is altered, changed or amended by the common council, with the consent of the company; and such ordinances may, from time to time, be changed, altered or amended, and such other provisions be made, as to the common council may seem proper, and be agreed to by said company." The railroad authorized to be constructed and operated within the city of Chicago by the ordinance of 1864, was simply a street railway for passengers, and it was confined to the use of animal power in moving its cars. Can it be contended, with any show of reason, the provision in section 3, "such ordinance

may, from time to time, be changed, altered or amended," and "other provisions made," confers power on the city council, ten years hence, to change the horse railroad so incorporated, into a steam railroad, and endow it with franchises as such corporations usually possess? If such extraordinary powers exist in this provision, the subject is not expressed in the title of the act, and the omission, under the constitution of the State, would be fatal, and it would be inoperative. The title of the act is, "An act concerning horse railways in the city of Chicago." No subject in relation to railways for the carrying of freights and passengers in the manner usually done by steam railways, is embraced in that title. The words used will bear no such construction. It is therefore apparent, if, in the body of the act, any subject in relation to steam railways is embraced, it is without authority of law. But aside from this view, it is not thought the provision contained in section 3 is broad enough to give the city council power to authorize what is conceded to have been a "horse railway" under the act of 1865, to become a "steam railroad" for the transaction of all business done in freight and passenger cars. The power given is, "such ordinance may, from time to time, be changed, altered or amended." Changing such ordinance has reference to making other provisions than as therein mentioned, for the running and management of a horse railroad. No other kind of a railroad was mentioned. Power to make changes in this ordinance for the running of a horse railroad in the city certainly does not, by any fair or reasonable construction, include power to create a steam railway doing a general railroad business, both passengers and freights, over the same route or elsewhere in the city.

It is said that at the time of the passage of the ordinance of 1883, there was no restriction whatever upon the Evanston road as to the use of steam,—that these restrictions that previously existed, ceased by the ordinance of 1872. If it is true that after the passage of that ordinance little or nothing

of the ordinance of 1864 remained, how does that affect the act of the legislature of 1865?   That act made the Evanston road a horse or street railway within the limits of the city of Chicago, and certainly the city council had no authority to convert it into a railway for all purposes.   All railroad franchises come from the State, and how could the common council, under power to amend an ordinance in relation to a horse railroad, create a railway for all purposes within the limits of the city, over the same route, or elsewhere within its jurisdiction?   Such a proposition, if insisted upon, would certainly have very little in its support.   But aside from this view, there is great force in the suggestion of counsel the ordinance of 1883 does not purport to be an amendment, change or alteration of the ordinance of 1864, or, indeed, of any other ordinance.   If valid, it confers new and independent power upon the railroad company without any sort of reference to the former ordinances, and it is in no sense an amendment to any former ordinance or ordinances.   It might be conceded the provisions of the ordinance of 1872 constituted an alteration or change in the ordinance of 1864, so far as it related to the use of steam by the railroad company, and yet that would fall very far short of sustaining the position taken, the company may use steam on a railway for all purposes, over the route described in the ordinance of 1883. Prior to the passage of the act of 1872, it is conceded that within the limits of the city of Chicago the Evanston road was nothing more than a street railway, to be operated by animal power.   That ordinance did not purport to change the character of the railroad to be constructed in Hawthorne avenue, from a street railway into a railway for all purposes. The utmost it can be claimed it did, was to allow the use of steam instead of animal power.   The track in Hawthorne avenue was restricted or limited to the use of passenger cars only, and the ordinance of 1872 simply authorized, so far as the track in that street is concerned, the use of steam instead

of animal power in moving its passenger cars.    It seems clear, first, the Chicago and Evanston Railroad Company has no authority from the State, under the act of 1865 or any subsequent act, to construct, maintain and operate any railroad other than what is commonly known as a street railway, within the limits of the city of Chicago; and second, so far as the ordinances of 1872 and 1883, or either of them, purport to endow the railroad company with franchises to construct, maintain and operate a railroad for all purposes, by steam, they are not within any power conferred on the city council by the act of 1865 or the general law under which the city is now organized, and to that extent they ought to be regarded as inoperative.

The question made as to the authority of either corporation to construct a railroad bridge over the Chicago river at the point indicated in the ordinance of 1883, needs only a brief discussion.    The Chicago and Lake Superior Railroad Company is incorporated under the act of 1872, in relation to incorporation of railroad companies.    Section 19 of that act expressly authorizes any company organized under its provisions, to cross any stream, and to erect a bridge for laying rails, and running cars thereon.    So far as any license from the city to bridge the Chicago river is necessary, it is fully given by the ordinance of December 24, 1883.    The company then has a franchise from the State, and a license from the municipal corporation within which the river is, to construct the bridge in question, and that would seem to be all the law requires, in any view.    Congress has never assumed exclusive control over the Chicago river.    The State has been permitted to control it.    It seems to be conceded by a uniform line of decisions, that legislation in respect to local matters affecting only certain localities, will be left to the State, and that duty may be, and is often, devolved by the State on local municipal governments.    It is well known that in some instances the State and general government may exercise

concurrent jurisdiction, and until the general government sees proper to act, State legislation is warranted. Concurrent jurisdiction exists, no doubt, in the Federal government and in the State, touching the control of the Chicago river, located, as it is, wholly within the jurisdiction of the State, and until Congress shall assume to act, the State has competent jurisdiction to legislate concerning it. (*Harmon* v. *City of Chicago*, 110 Ill. 400 ; *Escanaba Co.* v. *City of Chicago*, 107 U. S. 678.) As the Chicago and Lake Superior company has authority both from the State and municipal government to construct a bridge over the Chicago river, its right to do so would seem to be complete; but that authority must be a barren right until the company shall in some lawful way obtain the right to construct its track to and from the river bank. Until that is done, a bridge at the point in question would be of no practical utility. It would, in some degree, at least, no matter how well constructed, be an impediment to the navigation of the river, and its existence ought not to be permitted until demanded by public convenience for railroad travel and overland commerce.

Without discussing the question at length, I am of opinion the Chicago and Evanston Railroad Company has no authority, under its charter or otherwise, to construct a bridge over the Chicago river at the point in controversy. I do not find that the State has conferred upon it any such right, and the city council of Chicago possesses no power to grant such a franchise, under the general law or otherwise.

In my judgment the decree should be reversed, and relief granted, substantially, at least, as asked in the bill.